UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,               )
                                        )
  PLAINTIFF,                            )        CASE NO. 2:21-cr-56(1)
                                        )
        vs.                             )
                                        )
STEPHEN A. WILSON,                      )        **REDACTED**
                                        )
  DEFENDANT.                            )
_____ )

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
AUGUST 8, 2022; 3:45 P.M.
COLUMBUS, OHIO


  APPEARANCES:

  FOR THE PLAINTIFF:
        KENNETH L. PARKER
        United States Attorney
        By:  Emily Czerniejewski
        Assistant United States Attorney
        303 Marconi Boulevard
        Columbus, Ohio  43215

  FOR THE DEFENDANT:
        Federal Public Defender's Office
        By:  Stacey L. MacDonald, Esq.
        10 West Broad Street, Suite 1020
        Columbus, Ohio  43215




                    - - -


        Proceedings recorded by mechanical stenography,
transcript produced by computer.

2

1          MONDAY AFTERNOON SESSION

2          AUGUST 8, 2022

3                    - - -

4          THE COURT:  Ms. Stash, would you call the next case.

5          THE DEPUTY CLERK:  Case No. 2:21-CR-56-1, United

6     States of America versus Stephen A. Wilson.

7          THE COURT:  Just for line of sight ease, could I have

8     you all switch so I can see Ms. MacDonald and Mr. Wilson?

9          Thank you.

10         Ms. Czerniejewski, I believe that -- Ms. MacDonald,

11    you've already identified yourself for the record earlier.

12         MS. MACDONALD:  I did, Your Honor.

13         THE COURT:  Ms. Czerniejewski, what is the status of

14    this portion of the proceeding?

15         MS. CZERNIEJEWSKI:  Your Honor, on January 28th, 2022,

16    the defendant entered guilty pleas to Count One, Two and Three

17    of the superseding indictment which charged him with sexual

18    exploitation of a minor or attempted sexual exploitation of a

19    minor, and that was in violation of 18 U.S.C. 2251(a) and (e),

20    and there is one count of forfeiture that was contained in that

21    superseding indictment featuring ten separate items.  The final

22    PSR has been completed, and we are here for the defendant to be

23    sentenced pursuant to his guilty plea.

24         THE COURT:  Ms. MacDonald, was the Presentence

25    Investigation Report, including any and all revisions or

1  addenda, provided to Mr. Wilson at least ten days before this

2  hearing?

3        MS. MACDONALD:  Yes, Your Honor.

4        THE COURT:  Mr. Wilson, will you please stand.

5     Did you receive a copy of the presentence investigation

6  report?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  Including any and all revisions or

9  addenda?

10        THE DEFENDANT:  Yes, Your Honor.

11        THE COURT:  And did you review these materials?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  Did you discuss these materials with your

14  attorney Ms. MacDonald?

15        THE DEFENDANT:  Yes, Your Honor.

16        THE COURT:  Did Ms. MacDonald answer any and all

17  questions that you had with respect to the presentence report?

18        THE DEFENDANT:  Yes, Your Honor.

19        THE COURT:  Ms. MacDonald, are any of the factual

20  statements contained in the PSR disputed by the defense?

21        MS. MACDONALD:  Your Honor, while we initially had

22  some factual statements disputed, upon further reflection and

23  conversation, we're withdrawing that.  So, no, Your Honor.

24        THE COURT:  Ms. Czerniejewski?

25        MS. CZERNIEJEWSKI:  Your Honor, there's none on behalf

4

1   of the United States.

2         THE COURT:  There being no objections to the factual

3   statements contained in the PSR, the Court hereby adopts those

4   statements as its findings of fact.

5         Ms. MacDonald, there were, I believe, three objections

6   that the defense had to the probation officer's conclusions

7   with respect to the applicable advisory guidelines.

8         MS. MACDONALD:  No, Your Honor.  Those are regarding

9   the factual statements we have withdrawn.  We have no

10   objections to the guidelines.

11         THE COURT:  Okay.  There being no objections, the

12   Court finds that the probation officer properly calculated the

13   Total Offense Level to be 43, and the Criminal History Category

14   I.

15         Are there any objections to this calculation,

16   Ms. MacDonald?

17         MS. MACDONALD:  No, Your Honor.

18         THE COURT:  Ms. Czerniejewski?

19         MS. CZERNIEJEWSKI:  None.

20         THE COURT:  Ms. MacDonald, what is the defense

21   position with respect to the application of the 3553(a) factors

22   and the judgment that you would urge the Court to impose in

23   this case against the backdrop of this being an 11(c)(1)(C)

24   plea where the range in terms of the agreed-upon period of

25   incarceration is from 360 months, that is, 30 years, to 720

5

1  months, or 60 years?

2          MS. MACDONALD:  Yes, Your Honor, we are asking the

3  Court to accept the (c)(1)(C) plea to the 30 to 60 years.

4          THE COURT:  I have already -- if I'm not mistaken,

5  I've already accepted this.  I have accepted the 11(c)(1)(C)

6  plea.  The only question is whether he gets 30 years or 60.

7          MS. MACDONALD:  We would encourage the Court -- we're

8  asking the Court to sentence him to the 30 years, the 360

9  months.  Taking into account looking at both general deterrence

10  and specific deterrence, general deterrence, Mr. Wilson has no

11  prior criminal history.  This is his only offense.  Thirty

12  years is a significant length of time for anyone in a similar

13  situation to be facing incarceration.

14          More specifically, with specific deterrence, Mr. Wilson

15  is 39 years old.  The sentence at the low end is almost the

16  exact -- close to the length of time that he has been alive to

17  twice the length of time he has been alive, or just under that.

18  Doing some calculations, if the Court were to sentence him to

19  30 years, Mr. Wilson would not be released from custody until

20  he was in his 60s, at 63.  If the Court were to sentence him to

21  45 years, he would be 75 years.  And I understand the

22  government is seeking the maximum penalty of 60 years.  He

23  would be 88 years old.

24          THE COURT:  Did you say 88?

25          MS. MACDONALD:  Eighty-eight, Your Honor.

6

1      There's been studies out there that talk about the

2 development of age being -- speeding up for those in custody

3 because of the -- custody in prison is a punishment, but they

4 can age up to two years if they've been exposed to violence

5 sooner than maybe their biological age would be.

6      In this case, also why we're asking for the 30-year

7 sentence, also taking into account -- well, one, again, he

8 would be in his 60s -- at earliest he would be in his 60s.  The

9 victims in this case, in no way to minimize the victimization

10 to them -- I did hear from the Mayses that were talking about

11 wanting the children to be mature and adults before there's any

12 possibility that either Mr. or Mrs. Wilson get out.  With the

13 30-year sentence, the youngest child would be -- at least doing

14 the calculation, she would be 36, the oldest would be 54.  They

15 would be much older.  I believe there will probably be no

16 contact regardless, but just to put into context that this is a

17 significant length of time we're talking about.

18      But, then, for specific deterrence, the defense did

19 provide for the Court -- we have -- the Court has a presentence

20 report, but there's also an evaluation from Dr. Stinson in

21 addition to the defense sentencing memorandum.  And for the

22 Court to consider how we got here, how Mr. Wilson got here, I

23 believe Dr. Stinson talks about scripts, generational scripts,

24 and how it was not surprising, I guess, based on the

25 generational trauma that we ended up in this point in time.

1    There is a history of intra-familial molestation on both

2    sides of the family, a history of violence, suicide, substance

3    abuse, early relationships or pregnancies, and marriages.  And

4    Mr. Wilson has followed in the family script, not to excuse his

5    actions in any way, but to give the Court some context or

6    understanding as to how he got here and why a 30-year sentence

7    would be significant to make sure that Mr. Wilson, whenever he

8    eventually is able to leave prison, if that is a person in his

9    60s, is going to be fundamentally different than the person

10   that -- the person he was up until his arrest because during

11   that time he can undergo mental health assessments and

12   treatment, substance abuse treatment, sex offender treatment.

13   There's no history of him being able nor having attended any of

14   that treatment.  That was not something that the family engaged

15   in even in that generational abuse that was occurring.

16       A 30-year sentence, Your Honor, that is the equivalent

17   of 10,950 days, or 262,800 hours, that Mr. Wilson is locked up,

18   that his freedom is limited, that he is told when he can eat,

19   when his lights are on, where he can move.  But that's also

20   that amount of time that he can get counseling and treatment

21   and come to an understanding about why he did what he did, the

22   impact this has had on his family and his children, and what to

23   do so that he does not do this ever again.

24       He can leave the prison a different person than when he

25   has entered it.  We're asking the Court simply to give him the

1     opportunity to know that one day he, in fact, could leave the

2     prison.

3          He did not put his daughters through a trial even

4     knowing that a plea agreement in this case is paramount to

5     potentially a life sentence on the high end of the 60 years,

6     given the age that he would be, at the earliest, 88 when

7     released, assuming that he doesn't get sick or something happen

8     while he is incarcerated.  I think in 2022, a life expectancy

9     for a male in the United States was 78 years old out of a

10     prison context.

11          We would ask the Court that in making a recommendation

12     for prison, that he either go to -- depending on his security

13     level -- Elkton, Ohio; Petersburg, Virginia; or Lexington,

14     Kentucky.

15          Your Honor, I won't go into all of the prior family

16     information that's detailed in Dr. Stinson's report and the

17     presentence report and the sentencing memo, but I would ask the

18     Court to take into context when -- or give that some weight

19     when determining the appropriate sentence in this case.  Thank

20     you.

21          THE COURT:  Thank you, Ms. MacDonald.

22         Ms. Czerniejewski?

23         MS. CZERNIEJEWSKI:  Yes, Your Honor.  The government

24     intends to call an FBI agent as a witness in this case, in

25     addition, some of the biological children of Stephen Wilson

1    have victim impact statements specific to him, as well as two

2    of the foster parents.  I would ask to adopt the statements

3    that were already read at the sentencing hearing of Jessica

4    that addressed both Stephen and Jessica Wilson.  But at this

5    time, specifically, I'm seeking leave to have Agent Josh Saltar

6    take the stand.

7          MS. MACDONALD:  Your Honor, if we could briefly have a

8    sidebar.

9          THE COURT:  Sure.

10                        - - -

11      (The following proceeding was held at sidebar.)

12          MS. MACDONALD:  Your Honor, when the videos are

13   playing, I have learned that those that are in the galley can

14   actually see because of the defense screens to the back.

15   Mr. Wilson does not necessarily need to or want to watch the

16   videos.  I would have no objection if it's shown just to the

17   Court so it's not --

18          MS. CZERNIEJEWSKI:  Can you turn off your screen?

19          MS. MACDONALD:  Maybe.  I don't know how.

20          THE COURT:  Diane.

21          MS. MACDONALD:  Oh, yeah.  She can just play it to the

22   Court and witness.

23          THE COURT:  Diane, the videos that we're about to see

24   are to be played only to me and the witness.  You can configure

25   it so that counsel table doesn't get it but the witness and I

10

1    can.

2         (The following proceeding was held in open court.)

3         THE COURT:  Agent Saltar, please come forward and have

4    a seat.

5         Please proceed, Ms. Czerniejewski.

6                          - - -

7                      JOSH SALTAR

8    Called as a witness on behalf of the Plaintiff, being

9    previously duly sworn, testified as follows:

10                   DIRECT EXAMINATION

11   BY MS. CZERNIEJEWSKI:

12   Q.   Agent Saltar, you're still under oath.  I'm going over a

13   couple of background questions that you probably have just

14   answered, again, for purposes of the record for this.

15        Can you state your name?

16   A.   Josh Saltar.

17   Q.   Where are you currently employed?

18   A.   FBI.

19   Q.   How long have you been employed with the FBI?

20   A.   Since 2014.

21   Q.   Where are you assigned within them?

22   A.   I'm currently assigned to the Child Exploitation and

23   Human Trafficking Task Force.

24   Q.   How long have you been assigned to that task force?

25   A.   Approximately two-and-a-half years.

11

1    Q.   What types of cases do you handle within that task

2  force?

3    A.   We handle crimes against children as well as the human

4  trafficking type.

5    Q.   Are you the lead case agent assigned to the case

6  involving Stephen Wilson?

7    A.   Yes, I am.

8    Q.   Do you see Stephen Wilson in the courtroom today?

9    A.   Yes, I do.

10    Q.   Can you please point to him and identify something he's

11  wearing?

12    A.   A red and white shirt.

13       MS. CZERNIEJEWSKI:  The record will reflect in-court

14  identification of Mr. Stephen Wilson.

15       THE COURT:  The record will so reflect.

16  BY MS. CZERNIEJEWSKI:

17    Q.   Just to clarify, you said red and white shirt?

18    A.   I meant orange.

19    Q.   How did the case -- when did you first become assigned

20  to the case?

21    A.   Back at the end of February of 2021.

22    Q.   Again, can you just tell the Court what specifically

23  initiated the investigation of Stephen and Jessica Wilson?

24    A.   There was a disclosure made by ██████████, who is

25  the biological daughter of Stephen Wilson, that she had been

1    drugged and raped by Stephen.  This was initiated back in 2020.

2    Initially, the Bexley Police Department picked up the case and

3    it transferred over to me at the end of February 2021.

4        Q.   As the lead agent on the case, did you learn that in

5    that initial outcry by ██████████, she indicated that there were

6    video cameras in the home that may have captured it?

7        A.   Yes, she did.

8        Q.   When I say "it," I mean the sexual assault of ██████████

9    ██████ by her father Stephen.

10       A.   Yes.

11       Q.   How old was ██████████ at the purported time this took

12   place?

13       A.   Sixteen years old.

14       Q.   As the lead agent on the case, were you also in charge

15   of the forensic analysis of all of the electronics seized?

16       A.   Yes, I was.

17       Q.   Did you personally review the content of each of the

18   items that were seized in this case?

19       A.   Yes, I did.

20       Q.   Agent Saltar, did you recover a video of the sexual

21   assault of ██████████████ at the age of 16 by Stephen Wilson

22   in this case?

23       A.   Yes, I did.

24       Q.   When was that recorded?

25       A.   In November of 2019.

13

1    Q.   At the time, how old would ███████████ have been?

2    A.   Sixteen years old.

3    Q.   How long was the video in its entirety that you

4    recovered?

5    A.   Approximately 22 minutes.

6    Q.   Where specifically was that video recovered from?

7    A.   On Stephen Wilson's cell phone.

8    Q.   Prior to testifying today, did you review that video in

9    its entirety?

10   A.   Yes, I did.

11   Q.   Could you describe generally what that video depicts?

12   A.   That depicted Stephen Wilson and ███████████ in

13   what was Stephen Wilson's bedroom on a waterbed.  And

14   throughout the 22-minute video, Stephen Wilson sexually

15   assaulted, in various ways, ████████.  Throughout the

16   video, ████████ was in a semiconscious to unconscious

17   state.  And that lasted the full 22 minutes.

18          MS. CZERNIEJEWSKI:  For the record, I have marked as

19   Government Exhibit 1A, for purposes of Stephen's sentencing

20   hearing, the 22-minute video of -- that was just described by

21   Agent Saltar.  At this time, I'm seeking leave to publish

22   portions of that video to the Court.

23          THE COURT:  Any objection, Ms. MacDonald?

24          MS. MACDONALD:  No, Your Honor.

25          THE COURT:  You may do so.  You may proceed,

14

1  Ms. Czerniejewski.

2          MS. CZERNIEJEWSKI:  First, I'm asking leave to publish

3  1A.

4   BY MS. CZERNIEJEWSKI:

5   Q.   Agent Saltar, I'm going to play the video and have you

6  describe for the record what we saw in it.  We can go ahead and

7  press play.

8      (Video playing.)

9          THE WITNESS:  In the video, Stephen Wilson is laying

10  on the bed.  ████████████████ is laying there with her eyes

11  closed.  Stephen Wilson is leaning over her and kissing her on

12  the mouth.

13   BY MS. CZERNIEJEWSKI:

14   Q.   I'm now seeking leave to publish Exhibit 1B.  Again,

15  after the video plays, if you could just describe to the Court

16  what we just saw.

17      (Video playing.)

18          THE WITNESS:  Stephen Wilson is laying on the bed with

19  ████████████████.  Stephen is rubbing ████████████████, rubbing

20  her groin on the outside of her pants.

21          MS. CZERNIEJEWSKI:  Now seeking leave to publish

22  Exhibit 1C.

23      (Video playing.)

24          THE WITNESS:  Stephen Wilson, again, is laying on the

25  bed with ████████████████.  ████████████ has her eyes closed and

1  head to the left.  Stephen has his right hand down ████████

2  pants.

3  BY MS. CZERNIEJEWSKI:

4  Q.  Before we move on to the next clip, what was ████████

5  demeanor throughout the entire 22-minute video that you

6  reviewed?

7  A.  She was in a semiconscious to unconscious state

8  throughout the video.

9  Q.  Did you learn why that was?

10  A.  Yes.  It was because Stephen had given ████████ a pill

11  at the beginning of it.

12  Q.  When you said "at the beginning," the beginning of the

13  sexual assault?

14  A.  Correct.

15      MS. CZERNIEJEWSKI:  Seeking leave to publish Exhibit

16  1D.

17      THE COURT:  You may.

18   (Video playing.)

19      THE WITNESS:  Stephen Wilson laying on the bed with

20  ████████.  ████████ has her eyes closed and head

21  turned to the left.  Stephen has lifted ████████ shirt and

22  hoodie up and has his mouth over her breasts.

23      MS. CZERNIEJEWSKI:  Now seeking leave to publish

24  Exhibit 1E.

25      THE COURT:  You may.

16

1      (Video playing.)

2           THE WITNESS:  Stephen Wilson with ██████████ on

3    the bed.  ████████ has her eyes closed and head turned to the

4    side, and her pants were removed and Stephen was performing

5    oral sex on ████████.

6    BY MS. CZERNIEJEWSKI:

7    Q.   Now, in this clip, ████████ pants were off.  In

8    reviewing the video, did you learn how her pants were removed?

9    A.   Stephen removed her pants.

10          MS. CZERNIEJEWSKI:  Now seeking leave to publish

11   Exhibit 1F.

12          (Video playing.)

13          THE WITNESS:  Stephen Wilson is now on top of

14   ████████ again, ████████ has her head to the side and

15   eyes closed, and Stephen Wilson is in between her legs and is

16   rubbing his penis and inserting his penis into ████████

17   ████████ vagina.

18          MS. CZERNIEJEWSKI:  Now seeking leave to publish

19   Exhibit 1G.

20          THE COURT:  Granted.

21          (Video playing.)

22          THE WITNESS:  Stephen Wilson is on top of ████████

23   ████████ and is penetrating ████████ with his penis.

24          MS. CZERNIEJEWSKI:  And finally Exhibit 1H.  If we

25   could seek leave to publish that.

17

1        (Video playing.)

2           THE WITNESS:  Stephen Wilson has lifted ███████

3     ██████ legs over his shoulders and is vaginally penetrating

4     ██████.

5     BY MS. CZERNIEJEWSKI:

6     Q.   Agent Saltar, as you continued to investigate the crimes

7     committed by Stephen Wilson in this case, did you recover

8     conversations between Jessica and Stephen?

9     A.   Yes, I did.

10    Q.   Approximately how many text messages between the two of

11    them did you recover?

12    A.   Approximately 17,000.

13    Q.   Did you review each of those text messages for its

14    content itself?

15    A.   Yes, I did.

16    Q.   Can you generally describe for the Court what Stephen

17    and Jessica were discussing in these over 17,000 text messages?

18    A.   Most of the content revolved around sex between Stephen

19    and Jessica Wilson, as well as the fantasizing of Stephen and

20    Jessica with their biological children as well as with other

21    children as well.

22    Q.   Did you recover child pornography off Stephen Wilson's

23    phone?

24    A.   Yes, I did.

25    Q.   Off of his devices, I should say?

1    A.   Yes, I did.

2    Q.   Did you recover approximately -- do you recall

3  approximately how many images or videos or content of child

4  pornography that you recovered?

5    A.   It was approximately at least a thousand.

6    Q.   In addition to the video that was just published to the

7  Court, did you recover any additional videos directly related

8  to the sexual assault of this defendant's own children?

9    A.   Yes, I did.

10   Q.   What other videos did you recover?

11   A.   There was a 1-minute-and-22-second video of Stephen and

12 his biological daughter ███████████.

13   Q.   Where did you recover that video from?

14   A.   From Stephen Wilson's phone.

15   Q.   What was the date of the video?

16   A.   It was in 2016.

17   Q.   Was that June 26, 2016?

18   A.   Yes.

19   Q.   How old would ████████████ have been at that time?

20   A.   Approximately seven years old.

21   Q.   Did you review that video prior to testifying today?

22   A.   Yes, I did.

23   Q.   You indicated it was an over-one-minute video.  Can you

24 generally describe the entire video -- the content of the

25 entire video to the Court?

19

1     A.   It was a zoomed-in video, and Stephen Wilson was rubbing

2 his penis on ████████████ vagina.

3         MS. CZERNIEJEWSKI:  Your Honor, for the record, I

4 marked the video of Stephen and ██████ as Government's

5 Exhibit 2 for purposes of sentencing, which is contained in

6 full on a flash drive, and I am seeking leave to publish a

7 small portion of this video to the Court.

8         THE COURT:  Any objection?

9         MS. MACDONALD:  I would note we already watched this

10 video in the sentencing with Ms. Wilson.  We have no objection

11 to stipulating it's the same video.

12         MS. CZERNIEJEWSKI:  For the record, I think there was

13 confusion about it being played, and I want to be sure Agent

14 Saltar sees this portion -- I think we clipped a different

15 part -- and describes it accordingly.

16         THE COURT:  This is a different video than the one

17 I've already seen?

18         MS. CZERNIEJEWSKI:  I believe it's a little bit longer

19 than the one that was played before.  It generally depicts the

20 same thing, though.  I will knowledge that.

21         THE COURT:  It generally depicts --

22         MS. CZERNIEJEWSKI:  The same thing that was presented

23 during Jessica's sentencing hearing of Stephen rubbing his

24 penis on ████████████ nude vagina.

25         MS. MACDONALD:  It appears it's a different part of

1    the minute clip, but it's the same video.

2           THE COURT:  If it's him rubbing his penis on his baby

3    daughter and it's a different point in this act, the Court

4    doesn't need to see it.  Trust me.

5           MS. CZERNIEJEWSKI:  Then I will move on.

6           THE COURT:  It's probably imprinted in my brain.

7    BY MS. CZERNIEJEWSKI:

8    Q.    Agent Saltar, did you recover any additional videos or

9    images depicting the defendant's own children?

10   A.    Yes, I did.

11   Q.    I specifically want to talk about any images or content

12   you recovered regarding ████████████.  Did you recover media

13   content depicting ████████████████ in this case?

14   A.    Yes, I did, several images.

15   Q.    Can you describe generally the series of images that you

16   recovered?

17   A.    There was a series of images in which Stephen Wilson and

18   ████████████████ were in Stephen Wilson's basement.  ████████████

19   was looking off screen at a -- either monitor or TV that was

20   playing pornography and Stephen Wilson was standing next to

21   her.

22   Q.    Based on your investigation and what you learned about

23   this case, what was the purpose of Stephen showing ████████████

24   child pornography in the basement?

25   A.    Stephen had told ████████████ at the time that she could do

21

1   better regarding the pornography that was being displayed.

2   Q.   Where were these series of images depicting ▮▮▮▮▮▮

3   recovered from?

4   A.   From an SD card that was located in a storage unit.

5   Q.   Was the date on this series of images from

6   September 3rd, 2016?

7   A.   Yes.

8   Q.   How old would ▮▮▮▮▮ have been at that time?

9   A.   Approximately seven years old.

10   Q.   I want to direct your attention to three specific photos

11   from that series of images you just described which has been

12   marked in whole as Government Exhibit 3 for purposes of

13   sentencing.

14        MS. CZERNIEJEWSKI:  Your Honor, I'm seeking to publish

15   three of those images to the Court.

16        THE COURT:  You may.

17   BY MS. CZERNIEJEWSKI:

18   Q.   Beginning first with Exhibit 3A, can you describe what

19   this image depicts for the record?

20   A.   This is Stephen Wilson and ▮▮▮▮▮▮▮▮▮ in Stephen

21   Wilson's basement.  ▮▮▮▮▮ is looking at, again, what is a TV

22   or a monitor, and Stephen Wilson is standing over her and has

23   his penis out in front of ▮▮▮▮▮.

24   Q.   Now, directing your attention -- and seeking leave to

25   publish Government's Exhibit 3B.  Can you describe what this

1    image shows?

2    A.    This is, again, Stephen Wilson and ██████████ in

3    the basement.  ████████ is again looking at the TV and monitor.

4    Stephen is standing in front of her with his penis in his left

5    hand in front of █████████ face.

6    Q.    What's in Stephen's other hand?

7    A.    His right hand is holding a cell phone.

8    Q.    Finally, Exhibit 3C -- seeking leave to publish that to

9    the Court, the witness.

10        Can you describe what's being depicted in this image?

11   A.    Again, this is Stephen Wilson and █████████████.

12   Again, █████████ is looking off screen at the TV or monitor.

13   Stephen, again, has his penis in his left hand in front of

14   █████████, and has his cell phone in his right hand.

15   Q.    Thank you.

16        Agent Saltar, did you recover any additional images of

17   █████████ in this case?

18   A.    Yes, I did.

19   Q.    Where did those additional images come from?

20   A.    From Stephen Wilson's phone.

21   Q.    Do you know the date that the -- those images that you

22   just -- strike that.

23        Describe generally what additional images of ████████████

24   you recovered in this case?

25   A.    There were several images of █████████ in front of

23

1   Stephen with her hand on his exposed penis.

2   Q.   Was there a date that you were able to ascertain that

3   these images were actually produced?

4   A.   I don't recall.

5   Q.   Did you know ████████ approximate age in these images,

6   based on viewing her in conjunction with also seeing her

7   throughout the investigation in this case?

8   A.   She would have been approximately nine or ten.

9        MS. CZERNIEJEWSKI:  Your Honor, at this time, I'm

10  seeking leave to publish the images just described by the agent

11  to the Court specifically in Government's Exhibit 4A to begin

12  with.

13       THE COURT:  Yes.

14  BY MS. CZERNIEJEWSKI:

15  Q.   Agent Saltar, can you describe what we're looking at in

16  this image?

17  A.   ████████ is sitting on Stephen's lap and she's looking

18  off screen and she has Stephen's penis in her right hand.

19       MS. CZERNIEJEWSKI:  And seeking leave to publish

20  Exhibit 4B.

21       THE COURT:  You may.

22  BY MS. CZERNIEJEWSKI:

23  Q.   Describe, again, what's in this image.

24  A.   ████████, again, is sitting on Stephen's lap and is

25  looking off screen and has Stephen's penis in her right hand.

24

1    Q.    Thank you.

2         MS. CZERNIEJEWSKI:  Your Honor, I have nothing further

3    for this witness.

4         MS. MACDONALD:  No questions, Your Honor.

5         THE COURT:  Agent Saltar, thank you, sir.  You may be

6    excused.

7         MS. CZERNIEJEWSKI:  Your Honor, at this time, I have

8    two victims that are here that would still like to read victim

9    impact statements specific to Stephen.  One of them had to

10   leave so she asked me to read that.  I'm asking to go in order

11   beginning with ███████████.

12        THE COURT:  All right.

13        MS. CZERNIEJEWSKI:  Thank you.

14        THE COURT:  Ms. Stash, would you please swear in

15   ████.

16        (████████ sworn.)

17        MS. CZERNIEJEWSKI:  █████, I know you already

18   introduced yourself to the Court and described your age, and

19   you described how you were related to Jessica, but how are you

20   related to Stephen Wilson as well?

21        ██████████████  I'm his daughter.

22        MS. CZERNIEJEWSKI:  Did you prepare a victim impact

23   statement for the purposes of sentencing as it relates to

24   Stephen Wilson today?

25        ███████████  Yes.

25

1        MS. CZERNIEJEWSKI:  Would you wish to read that

2  statement to the Court at this time?

3        ██████████████  Yes.

4        MS. CZERNIEJEWSKI:  All right.  Go ahead.

5        ██████████████  I'm a 20-year-old woman, and I have

6  been a victim of sexual abuse, mental abuse, and emotional

7  abuse for nearly 13 years.  This being said, I am still

8  figuring out how to manage and deal with all the effects of the

9  trauma I endorsed.  These actions have caused me at a very

10  young age to not experience the childhood a child should get to

11  experience.  I was a little girl, I was innocent, and I knew no

12  better, and you stole all of my innocence as a child and

13  teenager away.  Not only did you do this to me, but you did it

14  to multiple innocent children.

15        My abuse, from what I can remember, began roughly before

16  going to kindergarten and progressively got worse.  He used

17  tactics to make me feel like what he was doing was,

18  quote/unquote, normal and that he, quote/unquote, loved me

19  which I now know was a mind trick I would believe and would let

20  him keep doing it.  It all started at the house where we buried

21  our bouncy balls.  I cannot remember that address, I just

22  remember the house by that.

23        Sorry.  I'm out of breath.

24        MS. CZERNIEJEWSKI:  Take your time.

25        THE COURT:  Take your time.

1  ███████████  The earliest memory I have is
2  laying in bed trying to watch a child movie called *Spirit*.  All
3  of a sudden, I remember you and my mom starting to do things
4  under the covers and kissing.  One thing went to another and
5  you guys were having sex with me awake right next to you in the
6  bed.  You told me to close my ears and that you guys were just
7  playing.  I was old enough to know what was going on.  One
8  thing you made sure of was that I was not allowed to leave the
9  room and I had to stay there.

10  Making our way to the new house in Bexley, it
11  progressively got worse.  You would pull out your laptop, pull
12  up porn websites where we could hear and see what you were
13  doing.  You didn't try to hide it.  You left it out in the
14  open.  For some reason you had no shame in it.  You would
15  instead pull your pants down and start jacking off in front of
16  your small, innocent children which is when my older sister and
17  I would take the girls upstairs or play outside.  From there
18  you started touching me in places you should have no access to.

19  This happened for years as we stayed there for roughly
20  eight years or so.  Not only is this where the sexual abuse
21  started, we were also neglected such as making my older sister
22  and I become parents to our siblings.  You dropped my mom off
23  at work and left us there at eight years old to care for three
24  to four small children at the time.

25  You often made remarks of how we were the dishwasher,

1 meaning we were responsible for washing all the dishes,

2 including all the baby bottles. I remember sitting on the

3 counter, wondering how I'm eight, to feeding an infant and one

4 year old while also trying to clean the house. I wasn't a mom

5 and that was not my job.

6 You made us do everything, not to mention we would have

7 no home-cooked meals. It was all simple meals such as oatmeal,

8 mac and cheese, or cereal which also had ants in it which we

9 were responsible for making ourselves when we were children,

10 scared, learning how to take care of ourselves but also babies

11 at the same time.

12 At the new house on Allegheny is when things got to

13 their very worst. You would say very nasty comments to us

14 about our body parts as we were going through changes and

15 growing. You had no care in the world. You kept doing it with

16 no remorse. You would slap our butts and brush your private

17 parts up against us as if it was no big deal. You had no care

18 in the world, and you kept doing it, again, with no remorse.

19 One of my younger sisters was around the ages of two or

20 four when we decided to pull her in my room and ask her if

21 daddy has said or done anything to her, which then she replied,

22 he made her touch down there in the basement. We, meaning my

23 older sister and I, had it on recording to turn it into the

24 police. We got grounded days later and deleted it because we

25 were scared.

28

1       This question we asked our little sister after my older

2  sister and I spent hours on the playground going through the

3  text messages between you and Jessica.  They were very nasty

4  and explicit such as fantasies you had with each of us in it,

5  and how you wanted the younger girls to be present in the room

6  when you had sex so they can listen and watch.

7       Who thinks that about their own children?

8       I knew it was really real.  I saw the text messages with

9  my own eyes, as did my older sister.  At your work jobs, you

10  had us come with you.  And even on the car rides, you would

11  expose yourself to us, and again when we got there.  You then

12  installed cameras which we all thought was very weird, at least

13  for the one in your bedroom, and you always got mad or yelled

14  when we questioned you.

15       There was one incident I will never forget as I do not

16  feel comfortable saying right now, but it was on the way to

17  school in your red pickup truck.  So I was in either seventh or

18  eighth grade and you made a comment about my sister's body part

19  that you most definitely should not have told me or have even

20  known.  I was sick after hearing that.  There's so many more

21  incidents we can talk about, but we would honestly be here for

22  probably hours.

23       Going to school or work or my boyfriend's was an escape

24  from reality.  I felt safe there.  I never wanted to leave.  I

25  got very comfortable with a few teachers there and told them

29

1    stories I knew they had to report.  I was happy.  Finally,

2    someone was hearing me and was going to be able to help me and

3    my sisters out.  But the system again failed us.  No matter how

4    many times the school would call, I quickly learned we'd become

5    coached on what to say anyway.  Of course, you guys were always

6    present during the questions they asked.  I started losing

7    doubt after so many reports, and we were still getting let down

8    by people who were supposed to protect us.

9         Fast forward to the summer before my sophomore year, I

10   went to our Aunt Courtney's which is your sister.  They were

11   very, very close.  She had told me an experience with my other

12   aunt that he did to her, and I couldn't imagine it or even

13   believe her, but it was concerning knowing that it was more

14   than just my sisters and I at the time.  Eventually, I told her

15   a few things of what was going on, and she seemed to believe

16   me.  I was finally going to get my sisters out but, of course,

17   nothing happened.  I would instead get threatened by her that

18   she was going to call him to pick me up and so forth, which I

19   was feeling very scared and nervous to go back after I just

20   told the truth.

21        She had made me write in a notebook everything.  After

22   getting sent back to my parents, she threatened to let him read

23   what I had said, which I knew I was back to square one.  I

24   couldn't trust my own family to help when I needed them the

25   most.  Even the police didn't believe me.  How was a

1  17-year-old high schooler going to save herself but, most

2  importantly, her younger sisters?  I honestly had no clue at

3  this point.

4         The fear I carried with me every single day up until

5  recent has been unbearable.  It was crucial living this life,

6  having parents but not good ones that were supposed to love and

7  care about you.  I've always questioned why my sisters and I?

8  But we got the bad ones.  What did we do to deserve this?

9         Oftentimes I blame myself.  I blame myself for not being

10  there enough and protecting them as much as I should have.  I

11  feel guilty saying I'd go to the end of the earth for my

12  daughter because why didn't I do that for my sisters who needed

13  me at the time the most?

14         Still to this day, I blame myself.  There's nothing

15  anyone can say or do.  I will forever carry that burden.  I

16  look at these girls as my own children as I have raised them.

17  I cared for them my whole life as if they were my own.  I

18  struggle a lot of days knowing I'll never have a dad to walk me

19  down an aisle, a grandfather for my children, a dad to teach me

20  about my car, a dad to show me how I'm supposed to be treated

21  in a relationship.  He ruined it all with all seven of his

22  daughters.

23         I have a daughter now.  Because of my trauma, I go above

24  and beyond to make sure she is safe and healthy, but I fear too

25  much for my daughter where it's taken over me.  I cannot live

1   a, quote/unquote, normal life.  I'm a young mom.  I hardly ever

2   get a break from my child because I fear something will happen

3   to her based off my own childhood.  I'm always overworried and

4   concerned.

5        It may seem just like an overprotective mom, but it's

6   much worse than that.  I'm always thinking, well, what if this

7   or that.  I wish I could leave my child with someone other than

8   her dad to get a break, but I simply cannot allow myself to do

9   it.  I'm beyond paranoid and want to feel I'm doing the most to

10  protect her.

11       Sitting here today hearing all of our statements and the

12  rest that you'll hear after me, and our feelings or emotions, I

13  hope you take that into consideration.  I hope you choose to

14  give Stephen the highest sentencing possible.  This has not

15  only affected my day-to-day life and how I viewed others, but

16  it has also affected my relationship with my partner and my

17  daughter.  He has caused me to suffer, and I will no longer let

18  him have that control over that.

19       He deserves the highest sentencing possible due to the

20  amount of people's lives he has ruined and destroyed.  I hope I

21  never see you another day in my life and may he rot in hell.  I

22  hope you remember your own words, that the truth will always

23  come out in the end, and it most definitely sure has.

24            THE COURT:  ██████, thank you very much.

25            ██████, one other thing.  I encourage you to

1  continue with your counseling.  But as deeply as I know how, I

2  want you to unburden yourself of the guilt.  You did the best

3  that you could, categorically, under the circumstances.  God

4  speed.

5          MS. CZERNIEJEWSKI:  Your Honor, next, I'd like to

6  publish the victim impact statement written by █████████

7  ████████.  She had to leave, but I'm seeking leave to do that.

8          THE COURT:  You may.

9          MS. CZERNIEJEWSKI:  Stephen, the first thing I want to

10  say is you tried to hurt me emotionally, physically, and

11  mentally.  That is not something a father does.  Even though

12  you continuously knocked me down, I rose above and came out

13  stronger than I have ever been and I feel so safe.  I have a

14  hula hoop, and on the inside of my hula hoop, I am in complete

15  control.  But so long you pushed yourself inside of that and

16  suffocated me in your negativity and toxicity.  But now I can

17  confidently say you're on the outside of that hula hoop and you

18  no longer control my happiness.

19          Since you got arrested and the truth about your actions

20  has finally rose to the surface, I've learned how to see

21  through people and their manipulation and have built

22  relationships with people who have changed my perspective on

23  life, and I no longer walk around with the shame of being a

24  snowflake or being too emotional.  Even though what you did to

25  not only me but my sisters was brutal and horrific, I have

33

1    radically accepted that I cannot change you.

2         So I hope the Court gives you the highest sentence so

3    hopefully one day you can finally see yourself for who you are,

4    a true narcissistic rapist.  For a year, while I was doing

5    everything I could at 17 to get you arrested, you told

6    everybody I was a liar and that I was being an ungrateful

7    teenager.  But now who is the one in the orange jumpsuit?

8              THE COURT:  Just one second.

9              MS. CZERNIEJEWSKI:  Your Honor, ███████ is asking to

10   sit at this time but asked if I could stand with her.

11             THE COURT:  Absolutely.

12             MS. CZERNIEJEWSKI:  ███████, you are still under

13   oath.  You had described your relationship to Jessica in this

14   case.  Can you just put on the record how you know Stephen

15   Wilson?

16             ████████████  I'm also his daughter.

17             MS. CZERNIEJEWSKI:  Did you prepare a statement today

18   on behalf of the sentencing for Stephen Wilson?

19             ████████████  I did.

20             MS. CZERNIEJEWSKI:  I'm going to have you read that at

21   this time.

22             ████████████  Stephen Andrew Wilson, okay, now

23   let's be real.  There was more bad than good in our daughter

24   and father relationship, but also because of the tension in the

25   room and guilt he had for us.  So I will start with good before

34

1  bad.  So let's start.

2       I did love it when we went with work with him and ate

3  and hung out and talked about life.  Yeah, I didn't open up a

4  lot not -- that's because I hate talking about my feelings.  So

5  you can probably imagine how I felt.  I kept the stress in so I

6  did not hurt my family, and I was also scared of being like one

7  of my sisters.  They went to the hospital too much.  I hate it

8  whenever I go in the door, I get hit with all the memories.

9  You never took us to the doctors.  Why?  You knew this was a

10  messed-up thing to do.  So why continue -- why continue --

11  wait.  Why continue and took -- and lie and brainwash us?  What

12  did we do?

13       So I see we got into the bad things.  They weren't

14  really happy moments with him.  He would always stay in the

15  basement or sleep and watch TV on his phone or work.  He was a

16  messed-up dad.  He would tell us that no one loved him and we

17  would run to love him.  There was one I remember by heart.

18  Jessica was pissed off at him and walked out.  He chased her.

19  They yelled.  He ran outside and ran to his room crying like he

20  just got yelled at by his parents.  I went in and remember

21  these words like it was yesterday.  He said "no one fucking --

22  no one loves me.  Why?  I do so much to try to help."

23       Then I sat there and was like, yeah, you help -- you

24  "help" us.  I gave him a hug and then you grabbed me in a weird

25  way.  I try not to think of it but it comes sometimes.

1           There was also another day when Jessica threw her

2      wedding ring and everyone went to go look for it.  This other

3      time happened a lot at home.  She would pack up and leave and

4      force us to leave and stay with him.

5           So, Judge, I want him to stay there for max, please.  I

6      don't want other kids to go through what we had to go through.

7      He needs to face his consequences for what he had gone through.

8           MS. CZERNIEJEWSKI:  Thank you, ███████.

9           THE COURT:  Thank you, ███████.

10          MS. CZERNIEJEWSKI:  There's two victim impact

11     statements left specific to Stephen.  I would ask to adopt all

12     the other ones that were read to both.  But I would re-call

13     Nicole Mays to the stand.

14          THE COURT:  Is Ms. Mays' testimony --

15          MS. CZERNIEJEWSKI:  It's different.

16          THE COURT:  Ms. Mays, please come forward.  You're

17     still under oath.

18          MS. CZERNIEJEWSKI:  Ms. Mays, you had previously read

19     your victim impact statement which addressed your wishes for

20     the maximum penalty for both Stephen and Jessica, but there was

21     a portion that had not been published to the Court related to

22     Stephen.  If you could read that.

23          MS. NICOLE MAYS:  Okay.

24          What kind of father are you?

25          I apologize.  I left the paper over there.  I grabbed

1   Jessica's and not Stephen's.

2          Emily, I'm sorry.  It's right here.  I apologize.

3          What kind of father are you?  When I heard all the

4   evidence against you, I couldn't believe what I was hearing.

5   You're sick.  You're disgusting.  You're a monster.  You preyed

6   on your own children because you knew you couldn't get away

7   with preying on others.  You say that drugs was the reason you

8   did this, right?  I laugh at that sorry excuse.  We all know

9   drugs don't force you to rape and molest children.  It was your

10  choice.  And if you want to claim it was drugs, then you could

11  have gotten help, gone to a meeting, or rehab, something.  The

12  facts are you did not stop.  You just kept doing these

13  horrible, horrific things.

14         The maximum amount of time in prison isn't enough for

15  what you did.  You ripped your children's innocent life away.

16  You deprived them of a childhood they deserved.  You left them

17  with scars and trauma that no child should ever have to endure.

18  But know that with all the pain and manipulation and the hurt,

19  these girls are not letting it defeat them or define them.  You

20  may think you have won trying to fool people, but you have lost

21  because the truth has been told.

22         MS. CZERNIEJEWSKI:  Thank you, Nicole.

23         THE COURT:  Thank you.

24         MS. CZERNIEJEWSKI:  Finally, I would re-call Michele

25  to the stand to read her letter to Stephen.

37

1    THE COURT:  You mean Ms. Bush?

2    MS. CZERNIEJEWSKI:  Michele Blake.

3    THE COURT:  I'm sorry.

4    Ms. Blake, you're still under oath.  You may proceed.

5    MS. MICHELE BLAKE:  Your Honor, when I was first told

6    I would be able to address the Court today, I did not think it

7    would be possible for me to get past my anger towards Stephen

8    enough to be able to write this.  It is impossible for me to

9    fully and adequately describe the impact he has had on █████████

10   life, her sisters' lives, or my life.  Unfortunately, he has

11   damaged multiple lives including the lives of his innocent

12   children.  There's no excuse for his actions, none.

13        Stephen was a father.  He was supposed to protect his

14   children, not hurt them.  It is because of his actions that his

15   children no longer live together and have been forced to start

16   over without their parents.  Due to Stephen's actions, ████████

17   will never know what it feels like to grow up in a safe and

18   stable home.  She has been forced to grow up quickly.

19        ████████  told me "food was not always available to us kids

20   because my dad did not like going to the store."  She remembers

21   being young and climbing on the counter to make sandwiches for

22   her and her sisters because her father would not make them

23   dinner, or being told to stay outside so her dad could be alone

24   in the house and take drugs.

25        Stephen failed to protect his children.  He failed to be

38

1    their father.  Stephen chose to be selfish.  He chose to put

2    his needs in front of his children.  He chose to hurt his

3    children, to rob them of their childhood.

4         Now, I get to support ███ as she struggles to

5    overcome the damage Stephen has caused.  I get to support her

6    when she has panic attacks, comfort her when she cries, and

7    take her to therapy.  It breaks my heart to see her struggling

8    to overcome the damage Stephen has caused, including learning

9    to trust men again.

10        Some days she does well.  Other days the smallest thing

11   can set her back by reminding her of the things he did.

12   Stephen is learning -- sorry.  ███ is learning coping

13   strategies and finding ways to deal with her trauma, but she

14   will never know what it would have been like to grow up in a

15   safe and stable home.

16        I am blessed to have ███ as a member of my family.

17   She is a thoughtful, supportive, talented teen.  Every day I

18   get to watch ███ grow.  I get to see her reach her goals,

19   but I also see the pain and scars Stephen made and continues to

20   make by not being the father ███ deserves.  I have and will

21   continue to be there for her.  I will teach her to drive, help

22   her apply to college and start a life on her own.  But I am not

23   her father.  That is a void I will never be able to fill.

24        I ask the Court to give Stephen the maximum sentence

25   possible for his crimes and to keep the no-contact order in

1   place.  Please do not allow Stephen to contact his children as

2   they work and try to heal from the pain he has caused them.

3          Thank you for your time in considering my wishes today.

4          THE COURT:  Thank you, Ms. Blake.

5          MS. CZERNIEJEWSKI:  Your Honor, the government has no

6   additional evidence to put forth at the sentencing hearing

7   today.  I am seeking leave to argue briefly.

8          THE COURT:  Please proceed with your argument.

9          MS. CZERNIEJEWSKI:  The evil that is sexual abuse

10  breeds in secrecy and darkness and thrives on silence and

11  complicity.  Stephen Wilson counted on that.  He counted on

12  that silence from his victims who were his own biological

13  daughters, and used his position of trust and authority as

14  their father to continue to manipulate, exploit, and abuse

15  them.  He relied on the complicity of Jessica Wilson, his wife,

16  in order to continue this vicious cycle for years.

17         Today, Your Honor is going to sentence Stephen Wilson

18  for the horrors he inflicted on his children and the hundreds

19  of children depicted in the images that were on the child

20  pornography collection that he had amassed.  At that point

21  today, in this moment, the darkness and secrecy of his actions

22  will finally come to light.  He will be forced to take

23  accountability for these unfathomable actions that he has put

24  forth on his own children.

25         The United States recognizes what it is asking the Court

40

1    to do today.  There are serious decisions that affect the rest

2    of the life of the person that's seated here before you today.

3    But the reason the United States is asking for such a serious

4    sentence, specifically the maximum possible sentence in this

5    case which is 60 years, 720 months, making the defendant

6    approximately 88 years old is because there has never been a

7    case that has warranted more.

8         Nothing was off limits for Mr. Wilson.  Nothing.  Not

9    his own children, not other children he had access to, not

10   children that were on the Internet that he continuously

11   exploited in child pornography groups, and not even innocent

12   children that he -- that were depicted on the Internet that he

13   photoshopped his own genitalia onto.  Nothing was beyond the

14   sexual deviancy of Stephen Wilson.  He knew no bounds, and this

15   went on for years and years and years.

16        THE COURT:  What role, Ms. Czerniejewski, do you

17   believe his family history, or scripts as Dr. Stinson set

18   forth -- let me read this to you.

19        Steve was disadvantaged and at risk literally from

20   conception.  He was born into a family where his paternal

21   grandfather sexually molested Steve's father, a paternal aunt,

22   Steve's full-blooded sister and a paternal half-sister.  On his

23   mom's side, two maternal uncles were incarcerated for molesting

24   their children.  On top of that risk, Steve was the product of

25   young and immature parents.

41

1       Dr. Stinson goes on to say his mother was just 15 years

2  old when he was conceived and was ill equipped to care for him,

3  still attending school herself and trying to work in the

4  evenings.  His father, too, was quite young, just 19 years old

5  when Steve was born.  His mother drank alcohol excessively, and

6  his father, a victim of sexual abuse by his own father, was a

7  drug addict.  This contributed to additional familial and

8  environmental instability as Steve's family was evicted for --

9  from various residences and Steve was thus made to move and

10  transfer schools multiple times as a youth, not just

11  destabilizing his home life but also destabilizing his

12  environment more generally, including his neighborhood and his

13  schooling.

14       There was significant discord between his parents to the

15  point that Steve holds a very vivid recollection of his dad

16  once pulling a gun on his mother during the outcome.

17       Steve's prognosis for a favorable outcome only worsened

18  as he moved into adolescence.  His parents divorced when he was

19  14 or 15.  Around that same time, he learned he had a

20  12-and-a-half-year-old paternal half-sister, the product of his

21  father's infidelity.

22       Moreover, it was around that same time that Steve's

23  maternal grandmother, a person he thought of more as a mother

24  than a grandmother, died.  From that point forward, things got

25  worse for Steve.  He ended up with a stepfather who was

42

1  addicted to pills and who at one point pulled a knife on Steve

2  before the stepfather ultimately went to prison for killing his

3  own father.  Steve ended up with a stepmother who was just six

4  years older than him, a person who could never -- a person he

5  could never see as a parental figure.

6       I just have one more short paragraph to read because

7  that was by background for my question which is embodied more

8  in this paragraph.

9       MS. CZERNIEJEWSKI:  Yes.

10      THE COURT:  These were the scripts, in quotes, that

11  Steve was introduced to at conception and that were reinforced

12  from birth forward.  Scripts are essentially self-destructive

13  routines that, from generation to generation, become so

14  predictable that members seem to be following a script, that

15  is, a plan that was developed for them that they were destined

16  to follow as that way of life was passed from one generation to

17  the next, each self-destructive process coming in on cue as the

18  plot unfolds.

19      In this case, Steve, like his father and stepfather,

20  turned to drugs.  Indeed, he had a significant substance use

21  problem, developing a mild Xanax use disorder and a severe

22  cannabis, cocaine, and ecstasy use disorder.  Like his parents,

23  he had his first child when he was a teenager, in this case, 17

24  years old.  Also like his parents, he married a teenager, a 17

25  year old, when he was just a teenager, 18 years old.  Then,

43

1    like his grandfather and multiple uncles, he went on to molest

2    his children.

3         MS. CZERNIEJEWSKI:  Your Honor, are you asking what I

4    make of it?

5         THE COURT:  What consideration, Ms. Czerniejewski,

6    does the Court give to that as we work to impose a

7    dispassionate sentence that is, at the same time,

8    individualized but cognizant of the great and deep wrongs that

9    were visited upon these young ladies as you heard me reference

10   in the sentence of the defendant Jessica Wilson?

11        Because, Ms. Czerniejewski, as well as you advocate for

12   the victims -- and you should because I've not seen victims of

13   this nature and magnitude in my career both as a lawyer and as

14   a judge.  But this is the reality with which we're faced.  So

15   it is not sufficient that you don't address that as well --

16        MS. CZERNIEJEWSKI:  Absolutely, Your Honor.

17        THE COURT:  -- in your recitation.

18        MS. CZERNIEJEWSKI:  Respectfully, Your Honor, the

19   report that Stephen Wilson gave the psychologist that was

20   evaluating him was done on July 28th, 2022.  There was no

21   verification of any information in this.

22        THE COURT:  Assume for the purpose of my question that

23   these things are not made up.

24        MS. CZERNIEJEWSKI:  If everything is factually

25   correct, then I would address specifically page 6 of this

44

1   report which indicates which of these adverse child experiences

2   applies to Stephen.  There's categories.  Emotional abuse, no.

3   So the forensic psychologist evaluating this defendant is

4   saying there's not an adverse child experience of emotional

5   abuse by Stephen Wilson.

6           Physical abuse, no, although he was bullied by his

7   cousin.  So Stephen Wilson has not experienced the adverse

8   childhood experience of physical abuse.

9           Sexual abuse, no.  Stephen Wilson was never sexually

10  abused.  I just want to put that out there.  There are reports

11  by him of other people in his family allegedly doing this to

12  others.  Nobody did this to Stephen.  So this generational

13  trauma of passing down what's been done --

14          THE COURT:  It was his sister who was sexually abused.

15          MS. CZERNIEJEWSKI:  Again, I -- respectfully, I don't

16  know what has happened, but I don't necessarily buy what he is

17  selling in his report to somebody who --

18          THE COURT:  Remember, you're an advocate now and you

19  have to follow the guardrails that I've just put in place.

20  Those guardrails are that we're going to assume for the purpose

21  of my question that those facts are true.  So I want you to

22  maintain your objectively, Ms. Czerniejewski.

23          MS. CZERNIEJEWSKI:  Then I would just continue to note

24  that as far as adverse child experiences, this forensic

25  psychologist also opined that he has not experienced emotional

1   or physical neglect.  The only life experiences that he has

2   been subjected to that would negatively impact how he is – now

3   an adult – are separated or divorced parents, a mother that was

4   treated violently, substance abuse in the home, mental illness

5   in the household, and that's it.

6        I would say to Your Honor that there are numerous people

7   in the United States with separated or divorced parents that

8   were subject to households filled with domestic violence or

9   addiction to substances and mental health.  Those are like the

10  four cruxes of American families, and none of them are raping

11  their own children to this extent.  None of them are sexually

12  assaulting their own children to this extent.  And not just

13  sexually assaulting, recording it, fantasizing about it years

14  later.

15       This is some of the most sick and depraved behavior, and

16  I don't think what we read in this report justifies it.  And

17  that's not just me being the United States saying give the

18  harshest sentence.

19           THE COURT:  I understand.

20           MS. CZERNIEJEWSKI:  It's me reviewing every text

21  message, every image, every video in this case and knowing that

22  this small snapshot of a report that purports to show who

23  Stephen was, or these scripts that he is subjected to, does not

24  even remotely sway my opinion about what his sentence should

25  be.  And that's because for the last 18 months I've been living

1     with this evidence.  The agent has been living with this

2     evidence, but this has been going on for decades in the home.

3     ███████████  just got on the stand and told you this has been

4     going on since she was a child.  She is 20 years old.  This is

5     years and years of exploitation and abuse.

6          I would note this report indicates there was a

7     seven-year period where he was sober and doing well.

8     Apparently something happened -- and I can't recall the exact

9     sentence.  But, more specifically, he decides he's not going to

10    use drugs anymore.  That takes the turn for the worse when a

11    friend gets out of prison and he starts reusing again.  Even

12    the times when he's sober, he is sexually exploiting his

13    children and children on the Internet.  Let's not forget

14    there's massive amounts of child pornography in this case.

15         THE COURT:  Thank you.  You answered my question

16    satisfactorily.  You can continue with the other parts of your

17    argument if you have anything further.

18         MS. CZERNIEJEWSKI:  I go back to the fact that this is

19    a hard sentence to ask for.  This is a hard sentence to give.

20    But this is a small amount of time compared to the fact that

21    these girls have been living with this their entire life and

22    they have to continue living it for the rest of their lives.

23    They don't want a relationship with their father.  They never

24    want to see him again.  You heard that multiple times.  They

25    are literally asking for the maximum possible sentence for

1 Stephen Wilson because of what he's done.

2     I think the peace of mind that a sentence like that

3 ensures is important in respect to what has been presented to

4 the Court. I mean, this is not a run-of-the-mill child

5 exploitation case. This is the child exploitation case, not

6 one, not two, but three biological children of this defendant,

7 all of whom have been exploited in the worst possible way. Not

8 even that, exploited and manipulated. They were told that

9 their sisters were liars. They were manipulated to not believe

10 each other and thereby isolating themselves, giving the

11 defendant better access to them in the first place.

12     I'm asking for a sentence of 60 years. I understand

13 it's substantial, and I understand that it's a hard sentence to

14 hand out, but if there was ever a case that warranted something

15 like this, it's this one. This goes above and beyond any

16 deviant sexual behavior that I have seen in my career, to Your

17 Honor's point. And I understand there's some hardships that

18 this defendant has suffered through. But don't we all? And

19 none of us are doing even a small amount of what he has been

20 proven beyond a reasonable doubt to have done.

21     I'm not going to reiterate every sentencing factor

22 outlined in my sentencing memorandum. I'm not going to tell

23 you that the general and specific deterrence in this case

24 warrants that kind of sentence. I've outlined it ad nauseam.

25     I do want to note, finally, that a lot of the focus of

48

1   this mitigation as relates to Stephen begins and ends with the

2   substance abuse history that he has experienced.  Again,

3   unfortunately, the United States doesn't buy what he is selling

4   because addiction is about as prevalent in the United States as

5   getting a parking ticket, and nobody -- there's no correlation

6   between those who use or abuse alcohol and substances and those

7   that sexually assault multiple times their own children and

8   then use that sexual assault in the filming of such to

9   fantasize about it for years to come.

10          Stephen Wilson is a sexual predator and he deserves to

11  be treated as much.  That warrants a sentence at the highest

12  possible range contemplated within this plea agreement, and

13  that's what the United States is asking for.

14          THE COURT:  Thank you, Ms. Czerniejewski.

15      Mr. Wilson, do you have any remarks?

16      Ms. Czerniejewski?

17      MS. CZERNIEJEWSKI:  I was just going to ask that the

18  girls be brought in.

19          THE COURT:  They're in.

20      MS. CZERNIEJEWSKI:  Perfect.

21          THE COURT:  Mr. Wilson, do you have any remarks you

22  wish to make on your own behalf?

23          THE DEFENDANT:  I didn't prepare anything.  I prefer

24  to speak from the heart.  I wanted to apologize to the Court

25  and yourself, Your Honor, for having the situation happen.  I

49

1    want to thank Nicole, Dana, Michele for raising my kids, doing

2    the job I was unable to do due to the cocktail of drugs I was

3    taking.

4         I have so much remorse.  My kids are my life.  Ever

5    since I started doing drugs back in 2000 -- restart back doing

6    drugs is when things happened and fell apart.  I wish I could

7    take everything back.  I really do.  What I've done is heinous.

8    I agree.  But I have changed.

9         I've started redoing Bible study in the corrections

10   facility, and I plan on doing all the programs I can take.  I

11   plan on getting into seminary and trying to follow that path to

12   God again.

13             THE COURT:  Please continue if you have any more.

14             THE DEFENDANT:  I don't know where else to go with it

15   right now, sir.

16             THE COURT:  I just wanted to make sure that there was

17   nothing more that you had to say.  Is there anything further?

18             THE DEFENDANT:  I also would like to apologize to my

19   kids.  I hope with my bad habits I had, they can better their

20   life and be able to be advocates to other people and help them

21   out in situations that I've put them through.  That would be

22   it, sir.

23             THE COURT:  Mr. Wilson, as I'm sure Ms. MacDonald has

24   indicated to you, my responsibility is to impose a sentence

25   that is sufficient but not greater than necessary to comply

1 with the purposes set out in the statute of conviction by the

2 Congress.

3       As I indicated with respect to your codefendant, these

4 crimes as denominated are heinous and egregious when spoken, to

5 wit, sexual exploitation of a minor, Counts One and Three, and

6 then attempted sexual exploitation after a minor, Count Two.

7 But sexual exploitation of a minor or attempted sexual

8 exploitation of a minor, when read, does not begin to

9 comprehend the extent, the egregiousness and the absolute, as

10 you put it, heinousness of the crimes that you perpetrated

11 against these children.  That's exacerbated by the fact that

12 they were your children, not that it's ever in any circumstance

13 permissible for one to exploit children.

14       The depravity -- and you referenced your heart.

15 Obviously, I can't say from where I sit and in the capacity in

16 which I sit that you don't have a heart.  As a layperson, if I

17 could be that for one moment doing this sentence, I would say

18 that you are, without doubt, the most heartless individual I

19 have ever seen.  As they say, "Have you ever seen anything like

20 that?"  My response would be I never even imagined anything

21 like that.  The depths of your depravity is beyond my moral and

22 mortal comprehension.

23       But having said that, I will be the first to admit that

24 though difficult, this is the -- this is my job, this is my

25 responsibility, and I will discharge that responsibility within

51

1   the bounds of the law.  But I want you to know under no

2   uncertain terms that the crimes that you committed against

3   these young ladies is one that will resonate with these young

4   ladies, and it should resonate with you and with your

5   codefendant because I don't know how you go about purging

6   yourself, cleansing yourself, finding redemption for what you

7   have done.

8       I say that understanding that you, too, had these

9   scripts, as Dr. Stinson put it.  But Ms. Czerniejewski is

10  absolutely correct.  As you go through these types of adverse

11  childhood experiences, there was no sexual abuse, physical

12  abuse, emotional abuse, emotional neglect or physical neglect.

13  It was almost as if you saw this -- you were prescient and you

14  saw these boxes and you decided because they weren't checked

15  that you would check them, because that is what you have

16  effectively done.  But as I told you when I spoke about the

17  indomitability of the human spirit, that's what your daughters

18  represent.

19      Mr. Wilson, the first part of the analysis that was --

20  that was just a preamble.

21      The first part of the analysis is a balancing test, that

22  is, to reflect the seriousness of the offense and to juxtapose

23  that to your personal history and characteristics.  In fact --

24  not as read but in fact, it is a most serious offense.  It goes

25  up to that line of murder almost, because when you rob someone

52

1   of their youth, you take away from them that which cannot be

2   given back.

3          It's like taking away someone's life.  You can't

4   singularly give life, but you can singularly take it away.  But

5   because of the indomitability of those precious young girls of

6   yours, you could not take away what was rightfully theirs.  You

7   made a gallant effort, if you and gallant can ever be put in

8   the same sentence.  But you made an effort to destroy those

9   girls, and you -- fortunately, for all of us, you have failed,

10  and now you must pay for these types of transgressions that are

11  as close to a crime against humanity as I've ever thought that

12  I'd see in a federal courthouse.

13         The Nuremberg trials, I suppose were -- they were at the

14  Hague, I believe.  That was not a federal courthouse as known

15  in the United States, but that's the closest thing that I can

16  see when I think about the crimes that you have perpetrated

17  here.

18         As I pointed out, even when I look at your history and

19  characteristics, it couldn't come close to justifying what

20  you've done.  You drove one daughter to make at least two

21  suicide attempts.  I don't know, and you didn't care to

22  describe for me or to tell me, what is the dark place within

23  you that would cause you to expose your penis to a young

24  daughter of yours or to play with your baby child's vagina with

25  your penis?  What type of satisfaction or gratification could

53

1    you get from doing that to your own flesh and blood?  I would

2    ask how you could live with yourself in doing that, but it's

3    obvious that you're capable of it because you have and you do.

4         So demographics don't equal destiny, Mr. Wilson, and

5    I'll never be convinced of that.  Because of what happened to

6    you, that does not justify in any way what you did to these

7    girls.  Admittedly, you didn't see boundaries, at least based

8    on what Dr. Stinson said and the sordid history of your clan.

9    But none of that justified what you did to them.  And,

10   obviously, in your allocution, you didn't set forth what

11   animated you to commit these heinous crimes.

12        You apologized to the Court.  There's no need to

13   apologize to me.  I wasn't the victim here.  You say that

14   you've changed, but query whether you've changed when you start

15   out apologizing to the sentencing authority, which leads me to

16   believe that that same manipulative individual who told his

17   daughters how much he loved them so that he could perform the

18   most heinous sexual acts upon them, he was back and he was

19   going to tell old Judge Marbley how sorry he was to the Court

20   that he committed these acts.  Then you thanked the people for

21   raising them.  But, you know, the apologies should be directed

22   to your daughters.

23        You talk about how you adopted religion, and I guess a

24   part of any religion is prayer.  So, if that's the case, then

25   you should have been telling me about how every day you pray

54

1   for the well-being of your daughters and for forgiveness as to

2   what you have done to them. It's not only unthinkable, but if

3   we were not in this forum where it was necessary, it should

4   also be unspeakable. Some things are just that terrible in

5   nature that no one could even contemplate how you could commit

6   these terrible crimes. You should suffer not in a transcendent

7   Biblical or religious way, but you are worthy of the full

8   extent and breadth of punishment that can be meted out under

9   the law.

10          When we get to it, we will discuss -- I will discuss

11  what rehabilitative efforts can be undertaken not to redeem

12  your soul, which may be irredeemable, but to address the issues

13  that led you to do what you have done which is, or at least

14  should be on a moral continuum, unforgivable.

15          The sentence I will impose will reflect the seriousness

16  of the offense in order to remote respect for the law and to

17  provide just punishment for the offense. That is the

18  retributive ideal of justice. Society is punishing you for

19  violating its criminal laws.

20          It must afford adequate deterrence to criminal conduct.

21  There are two aspects of deterrence. General deterrence -- and

22  as I explained earlier, anyone who would contemplate, if there

23  exists such evil -- anyone who would contemplate doing what you

24  did would be dissuaded from carrying out these types of crimes

25  lest they suffer the full weight and breadth of American

55

1    jurisprudence punishment, and they would be dissuaded from

2    following this path.

3         The other interest sought to be vindicated by deterrence

4    is specific deterrence.  I want to impose a sentence upon you

5    which is so severe that you would not be able to -- you would

6    refrain from this type of criminality or any type of

7    criminality lest you suffer the same or similar fate.  But in

8    addition to that, because of the nature of what you've done,

9    Mr. Wilson, I'm going to give you a sentence that is severe

10   enough such that even if you had the desire to perform these

11   acts again, you would be incapable of these acts, although in

12   law school we always would -- when you take decedents' estates

13   and trust, there is a concept known as the fertile

14   octogenarian.

15        It was thought that women would still be able to bear

16   children at 80; so many of the laws that were enacted and that

17   dealt with the passing down of property contemplated that women

18   could still bear fruit in their 80s.  But it was limited to

19   women.  It was not to men.  There was probably a legitimate

20   reason for that.  I'm going to take every step that I can to

21   make sure that you are not an exception to that rule.  So you

22   will not be in a position, Mr. Wilson, ever to harm any person

23   again.  You have visited your last harm upon anyone.

24        The sentence I will give will protect the public from

25   further crimes of the defendant.  That is the incapacitation

1  ideal, Mr. Wilson.  The theory is that if you're locked away,

2  you can't harm anyone.  But you will be locked away for such a

3  long time that when and if you get out, you will be physically

4  incapable of harming anyone.

5  Finally, the sentence I will give will provide you with

6  needed educational or vocational training, medical care or

7  other correctional treatment in the most effective manner.

8  That is the rehabilitative ideal, Mr. Wilson.  As part of your

9  sentence, you will have sex offender training.  You will have

10  mental health training and all of that, to prepare you for life

11  on the outside as an octogenarian.

12  I will now state the sentence I intend to impose, but

13  counsel will have a final opportunity to make any legal

14  objections before it is imposed.

15  Pursuant to the Sentencing Reform Act of 1984 and 18

16  United States Code Section 3553(a), it is the judgment of the

17  Court that the defendant, Stephen A. Wilson, is hereby

18  committed to the custody of the United States Bureau of Prisons

19  to be imprisoned for a term of 360 months on each count to run

20  consecutively.  That is, you will be given 720 months,

21  Mr. Wilson, or 60 years.  When you get out, you'll be 88.

22  Upon release from imprisonment at or about the age of

23  88, you shall serve a term of supervised release of life on

24  each count to run concurrently.  Within 72 hours of release

25  from imprisonment, you must report to the probation office in

1    the district to which you are released.

2            I want to take a moment here because Ms. MacDonald made

3    a compelling argument.  Ms. MacDonald is one of the best

4    lawyers who appear in my court day in and day out.  She argued

5    from the report of Dr. Stinson.  I want the record to reflect

6    that I gave due consideration to Dr. Stinson's report and your

7    background because, but for the report, I may have rejected the

8    11(c)(1)(C) plea on the basis that 60 years was not enough time

9    for what you have done to these young ladies.  I just want the

10   record to be clear on that.

11           While in the Bureau of Prisons, you shall participate in

12   substance abuse, sex offender and mental health counseling.

13   While on supervision, you must not commit another federal,

14   state or local crime.  You shall be prohibited from possessing

15   a firearm, ammunition, destructive device or dangerous weapon.

16   You must not unlawfully possess a controlled substance.  You

17   must refrain from any unlawful use of a controlled substance.

18           You must submit to one drug test within 15 days of

19   release from imprisonment and at least two periodic drug tests

20   thereafter as determined by the Court.

21           You must cooperate in the collection of your DNA as

22   directed by the probation officer, and you must comply with the

23   standard conditions of supervision that have been adopted by

24   this Court, as well as the following special conditions.  You

25   shall participate in a sex offender treatment program to

1  include a sex offender risk assessment, psychosexual

2  evaluation, and/or other evaluations as needed.  You shall

3  follow the rules and regulations of the sex offender treatment

4  program as approved by the probation office.  You shall sign

5  all necessary authorization forms to release confidential

6  information so that treatment providers, the probation officer,

7  polygraph examiner and others are allowed to communicate openly

8  about your course of treatment and progress in treatment.

9      You shall make a copayment for sex offender treatment

10  services not to exceed $25 per month which is determined by the

11  probation officer's assessment of your ability to pay.

12      You shall be subject to periodic polygraph examinations

13  at the discretion and direction of the probation officer as

14  means to ensure that you are in compliance with the

15  requirements of your treatment or supervision.  The polygraph

16  testing will be at your expense based on the probation

17  officer's assessment of your ability to pay.

18      Your residence and employment shall be preapproved by

19  the probation officer and must be in compliance with state and

20  local law.

21      You shall not view or possess material, images, videos,

22  or computer files containing sexually explicit conduct as

23  defined by 18 United States Code Section 2256(2)(a) and (b).

24  You shall have no contact with any minors.  The term contact

25  extends to all forms of communication such as email, telephone,

1    text, letter, and any other form of electronic communication.

2    This provision does not encompass persons under age 18 such as

3    ticket vendors, cashiers or waiters with whom you must deal in

4    order to obtain normal commercial services.

5        You shall be prohibited from loitering where minors

6    congregate such as, but not limited to, playgrounds, arcades,

7    amusement parks, recreation parks, sports events involving

8    minors, shopping malls and public swimming pools.

9        You shall submit to the installation of software and to

10    monitor computer activities on any computer you're authorized

11    to use at your expense. The software will record any and all

12    activities on your computer. The software will be checked on a

13    periodic basis. You have no expectations of privacy regarding

14    computer use or information stored on the computer and shall

15    make others -- make other users of said computer aware of the

16    monitoring software.

17        The defendant - you, Mr. Wilson - understands that any

18    information gathered by said software may be used against you

19    in subsequent court actions regarding your computer use and the

20    conditions of supervision. Furthermore, you shall comply with

21    the rules set forth in the computer and Internet monitoring

22    agreement and the computer and Internet acceptable use

23    agreement as adopted by the Southern District of Ohio.

24        In consideration of 18 United States Code Section

25    3583(d)(3), you shall submit and/or surrender any media device

60

1  to which you have access or control, to a search based on

2  reasonable suspicion of contraband or evidence of a violation

3  of a condition of supervision.  A media device is defined as,

4  but not limited to, any device which is capable of accessing

5  the Internet, storing images, text, or other forms of

6  electronic communication.

7          You shall participate in a program of mental health

8  assessment and counseling as directed by the probation office

9  until such time as you are released from such program by the

10  probation office.  You will make a copayment for treatment

11  services not to exceed $25 per month which is determined by

12  your ability to pay.

13          You shall be evaluated to participate in a program of

14  testing and treatment for alcohol and controlled substance

15  abuse as directed by the United States Probation Office until

16  such time as you are released from the program by the probation

17  office.  You will make a copayment for treatment services not

18  to exceed $25 per month which is determined by your ability to

19  pay.

20          You will have no direct or indirect contact with the

21  victims, your daughters, while they are of minority.  When they

22  reach majority, they may contact you should they choose to do

23  so, but you can certainly not have any contact with them

24  without the prior written consent of the probation office or

25  the probation officer.  You have forfeited that right with your

1   contumacious behavior.

2          I find that you do not have the ability to pay a fine.

3   However, pursuant to the provisions of 18 United States Code

4   Section 3663A, you have to make restitution in the amount of

5   $3,000 per identified victim in this matter for a total of

6   $9,000.  Restitution is due immediately with any unpaid balance

7   to be paid in the amount of not less than 10 percent of your

8   net income per month as a condition of supervised release.

9          While incarcerated, if you are working in a nonUNICOR or

10  Grade Five UNICOR job, you shall pay $25 per quarter toward

11  your restitution obligation.  If you're working in a Grade One

12  through Four UNICOR job, you shall pay 50 percent of your

13  monthly pay toward the restitution obligation.  Any change in

14  this schedule shall be made only by order of the Court.

15         It's the Court's deepest desire, Mr. Wilson, that in 60

16  years, you will be able to pay the $9,000 that you are required

17  to pay.  I haven't done the math, but it's my hope that --

18  that's nothing.  It's like sneezing on a forest fire in terms

19  of making these young ladies whole, but I want them to be made

20  whole in every miniscule way they could.  I want you to be

21  responsible for doing everything that the law will empower you

22  and require you to do to make those young girls whole.

23         Pursuant to 18 United States Code Section 3612(f)(3)(A),

24  I waive the requirement of interest on any balance of the

25  restitution not paid within 15 days after judgment.

62

1    It is ordered that you pay a special assessment of $300,

2    the JVTA assessment of $15,000, and up to $50,000 under 18

3    United States Code Section 2259(a) which shall be due

4    immediately.

5    The items listed in the forfeiture allegation of the

6    superseding indictment are hereby forfeited to the government.

7    Are there any objections to the sentence as stated,

8    Ms. MacDonald?

9    MS. MACDONALD:  Yes, Your Honor.  Just a clarification

10   point.  The Court has sentenced him to 360 months per count

11   consecutive.  That actually goes outside the range of the

12   (c)(1)(C) plea.  That becomes 90 years or 1,080 months.  So the

13   Court would either need to --

14   THE COURT:  You know what?  You're right because there

15   are three counts.

16   MS. MACDONALD:  Yes, Your Honor.  So the Court would

17   need to run one concurrent or reduce two to --

18   THE COURT:  I'm going to run One and Three

19   concurrently, and Two consecutively.

20   Thank you.  Math was not my strong suit, Ms. MacDonald.

21   MS. MACDONALD:  No objections other than that

22   clarification.

23   THE COURT:  Any objection from the government?

24   MS. CZERNIEJEWSKI:  None, Your Honor.

25   THE COURT:  Mr. Wilson, you may appeal this sentence.

63

1    If you cannot afford an appeal, you may apply for leave to file

2    an appeal *in forma pauperis*.  I must caution you that you may

3    appeal on one or two grounds or both.  You may appeal if you

4    believe that Ms. MacDonald has rendered ineffective assistance

5    of counsel, and/or you may appeal if you believe that

6    Ms. Czerniejewski or one of the attorneys in the United States

7    Attorney's Office has been guilty of -- one or more, have been

8    guilty of prosecutorial misconduct.

9            If you wish to appeal on one of these two bases or both,

10   you must file a motion with the clerk of court.  Any motion

11   must be filed within 14 days of the time that I enter judgment

12   on your sentence.

13           Do you wish the Court to direct the clerk's office to

14   prepare or file a notice of appeal on your behalf?

15               THE DEFENDANT:  No, Your Honor.

16               THE COURT:  Ms. MacDonald, are there any other matters

17   that we need to take up at this time?

18               MS. MACDONALD:  Not from the defense, Your Honor.

19               THE COURT:  Thank you.

20           Ms. Czerniejewski?

21               MS. CZERNIEJEWSKI:  Nothing further.

22               THE COURT:  I want to thank everyone for their

23   patience.  It's gone a little over five hours.  But the issues

24   are serious, the transgressions are beyond the pale of reason

25   and comprehension.  So I want to thank everyone for their

64

1   patience and cooperation.

2           (Proceedings concluded at 5:39 p.m.)

3                           – – –

65

<u>C E R T I F I C A T E</u>

I, Shawna J. Evans, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Algenon L. Marbley, Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


s/Shawna J. Evans_____
Shawna J. Evans, RMR, CRR
Official Federal Court Reporter


April 14, 2023